UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

HUEY PETER MIGUES, JR.            CIVIL ACTION NO. 6:18-cv-01611

VERSUS                           JUDGE SUMMERHAYS

ANDREW SAUL, COMMISSIONER         MAGISTRATE JUDGE HANNA
OF THE SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

for further administrative action.

## Administrative Proceedings

The claimant, Huey Peter Migues, Jr., fully exhausted his administrative

remedies before filing this action in federal court.  He filed an application for

supplemental security income benefits ("SSI") on January 21, 2016, alleging

disability beginning on January 4, 2013.[1]  His application was denied.[2]  He then

requested a hearing, which was held on November 9, 2017 before Administrative

---

[1]      Rec. Doc. 11-1 at 188.

[2]      Rec. Doc. 11-1 at 109.

Law Judge Holly Hansen.[3]  The ALJ issued a decision on December 28, 2017, concluding that the claimant was not disabled within the meaning of the Social Security Act from the date of his application for benefits through the date of the decision.[4]  The claimant asked the Appeals Council to review the ALJ's decision, but the Appeals Council found no basis for review.[5]  Therefore, the ALJ's decision became the Commissioner's final decision.[6]  The claimant then initiated this action, seeking judicial review of the Commissioner's decision.

## <u>Summary of Pertinent Facts</u>

The claimant was born on May 31, 1963.[7]  At the time of the ALJ's decision, he was fifty-four years old and less than six months away from his fifty-fifth birthday.  He has a sixth grade education[8] and relevant work experience as a floor hand – roustabout, roughneck, rigger, motor man, driller – in the oil and gas industry, working primarily on workover rigs and in plugging and abandonment operations.[9]

---

[3]     A transcript of the hearing is found in the record at Rec. Doc. 11-1 at 79-108.

[4]     Rec. Doc. 11-1 at 64-72.

[5]     Rec. Doc. 11-1 at 347.

[6]     *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]     Rec. Doc. 11-1 at 188, 208.

[8]     Rec. Doc. 11-1 at 97-98.

[9]     Rec. Doc. 11-1 at 82-86, 99-100, 213.

He alleged that he has been disabled since January 4, 2013[10] due to neck problems and a back injury.[11]

On March 4, 2013, the claimant was in a motor vehicle accident. That same day, he had a normal CT scan of his head at Abbeville General Hospital in Abbeville, Louisiana.[12] A week later, on March 11, 2013, the claimant saw Dr. Robert D. Franklin, a physical medicine and rehabilitation practitioner, at the request of his attorney.[13] The claimant reported hitting his head during the recent motor vehicle accident and also reported that he was having headaches. The claimant also claimed that he injured his neck, upper back, low back, and right knee in the accident. Dr. Franklin noted that the claimant walked with a limp. Examination showed pain on palpation over the left frontal region of his head; the claimant complained of pain and tightness when trying to rotate his neck; and he had pain on palpation over the C7 prominence, lower paracervical musculature, and bilateral superior trapezius muscle groups. He complained of pain with forward flexion of the lumbar spine, extension of the lumbar spine, and on palpation in the bilateral lower lumbar paraspinals. He complained of pain with movement of the right knee, pain on

---

[10]     Rec. Doc. 11-1 at 188, 212.

[11]     Rec. Doc. 11-1 at 212.

[12]     Rec. Doc. 11-1 at 279.

[13]     Rec. Doc. 11-1 at 289-290.

palpation over the right medial joint line of the right knee, and a small resolving excoriation was noted. Dr. Franklin's assessments were headaches, cervical and lumbar strain, possible underlying spinal pathology, and right knee pain of undetermined etiology. Dr. Franklin proposed further diagnostic testing, and he prescribed Lodine, Flexeril, and Ultram.

An MRI of the claimant's cervical spine,[14] obtained on March 18, 2013, showed straightening of the normal cervical lordosis with a slight reversal centered at about C4-5; a C4-5 bulge or herniation with a small amount of extruded disc material extending inferiorly and flattening the ventral cervical cord with mild to moderate canal and foraminal stenosis; and a diffuse bulge at C5-6 abutting the ventral cervical cord with mild to moderate canal stenosis. An MRI of the lumbar spine obtained on the same day showed mild bulging within the lower lumbar spine but no significant canal or foraminal stenosis.[15]

The claimant returned to Dr. Franklin on April 1, 2013.[16] His head and right knee pain had resolved but he continued to complain of neck, upper back, and low back pain. Dr. Franklin discussed the results of the MRIs with the claimant and recommended a spinal second opinion.

---

[14]    Rec. Doc. 11-1 at 277.

[15]    Rec. Doc. 11-1 at 278.

[16]    Rec. Doc. 11-1 at 288.

The claimant returned to see Dr. Franklin on April 29, 2013, May 28, 2013, June 25, 2013, July 22, 2013, and August 20, 2013.[17]   His symptoms and his medications remained the same.

When the claimant saw Dr. Franklin on September 17, 2013,[18] Dr. Franklin added Robaxin to the medication regimen and continued the Flexeril and Ultram. Dr. Franklin noted that the claimant lacked cervical and lumbar range of motion and complained of pain in both of those areas.

The claimant returned to Dr. Franklin on November 4, 2013 and December 5, 2013, with unchanged symptoms, findings, and medications.[19]

On March 18, 2016, the claimant was examined by Dr. Andriette Fitch at the request of the state disability office.[20]   The claimant complained of intermittent throbbing and burning low back pain that radiated into both of his legs.  He rated the pain at seven out of ten.  He also complained of intermittent soreness and throbbing pain in his neck that did not radiate and worsened with different positions.  He rated the neck pain at eight out of ten.  He claimed that nothing worsened or alleviated his pain, and he denied taking any pain medication.  The claimant reported that he was

---

[17]     Rec. Doc. 11-1 at 283-287.

[18]     Rec. Doc. 11-1 at 282.

[19]     Rec. Doc. 11-1 at 280-281.

[20]     Rec. Doc. 11-1 at 266-270.

able to dress and feed himself, had difficulty standing for thirty to sixty minutes, had difficulty lifting more than ten to twenty-five pounds with his right arm, could climb only two or three steps, and was unable to sweep, mop, vacuum, mow the grass, or care for a yard. He stated that he could cook for thirty to sixty minutes and do dishes for fifteen to thirty minutes. He stated that he could write his name, but could not balance a checkbook. Dr. Fitch noted that the claimant could get up and out of a chair without difficulty and was able to get on and off the examination table without difficulty. She observed that his gait was normal. Dr. Fitch stated that the claimant's vision was grossly normal, but she also stated that his visual acuity was 20/200 without correction in both eyes, which is inconsistent because a person whose vision is 20/200 is legally blind. Sitting and supine leg raise tests were positive for both legs. Dr. Fitch found that the claimant had normal grip strength and normal fine and gross manipulative skills in both hands. His reflexes were normal, his motor strength was normal in all extremities, and his sensation was intact to pinprick and touch over his upper and lower extremities. Dr. Fitch found that the claimant had a normal range of motion in his cervical spine, but she noted that he had a limited range of motion in his lumber spine upon both forward flexion and extension. X-rays of his cervical spine showed narrowing of the disc space at C4-5 and C5-6 with cervical spondylosis. X-rays of the lumbar spine showed L4-5 anterolisthesis, mild scoliosis, and disc space narrowing at L1-2 and L4-5. In Dr. Fitch's opinion, the claimant was

capable of standing and walking frequently in an eight-hour work day, had a limited ability to bend or stoop, and could lift or carry less than five pounds on a frequent basis with either arm.

On October 6, 2016, the claimant was seen by nurse practitioner Simmie Soileau at Abbeville General Hospital with regard to back pain.[21]  The claimant reported that he had experienced low back pain and neck pain since a motor vehicle accident in 2013.  He further reported that his neck hurt more – and more often – than his back.  He also reported that his neck pain radiated into his right arm.  At this visit, the claimant denied having any neck pain but stated that his low back was sore. He denied radiation of the back pain into his legs.  He stated that his last physical therapy was in January 2014 and that he had not had a medical provider since that date.  The nurse's impressions were low back pain, neck pain, and obesity.  The claimant was referred for physical therapy.

The claimant again saw Nurse Soileau on December 6, 2016 for an upper respiratory infection.[22]  It was noted that he was scheduled to begin physical therapy on December 8, 2016.

---

[21]     Rec. Doc. 11-1 at 308-312.

[22]     Rec. Doc. 11-1 at 313-314.

On April 27, 2017, the claimant again saw Nurse Soileau, requesting a referral for physical therapy due to his neck and back pain.[23]  Although Nurse Soileau had referred the claimant for physical therapy the previous October, the claimant had cancelled multiple appointments and had not yet started therapy.  He reported that his neck pain was now radiating into his right shoulder intermittently.  He also reported intermittent numbness and tingling in both legs.  His blood pressure was also elevated.

Computed radiography testing on May 1, 2017 showed diffuse spondylotic changes without acute abnormality in the lumbar spine.[24]  With regard to the cervical spine, it showed a straightening of the normal lordotic curvature; disc space narrowing with anterior spurring at C3-4, 4-5, and 5-6; and bony foraminal encroachment at C4-5 bilaterally.[25]

The claimant returned to Nurse Soileau on May 16, 2017.[26]  She noted that lab work showed that he had hyperlipidemia, and he was started on medication for that condition.  With regard to his neck and low back pain, he was referred to physical therapy, advised to use over-the-counter pain medications, educated on

---

[23]    Rec. Doc. 11-1 at 315-319.

[24]    Rec. Doc. 11-1 at 294.

[25]    Rec. Doc. 11-1 at 295.

[26]    Rec. Doc. 11-1 at 320-325.

proper body mechanics, advised to use gentle stretching exercises, and advised to alternate heat and ice. She also noted that he requested an MRI because his lawyer said he needed one for his disability case.

When the claimant returned to Nurse Soileau on June 19, 2017,[27] he had not yet begun physical therapy. He reported intermittent burning pain in his right arm and shoulder for about six weeks. Examination showed a full range of motion in his right shoulder and right elbow and equal strength in his hands. He reported getting minimal pain relief from over-the-counter medications. His high blood pressure had resolved. Pravastatin was continued for his hyperlipemia, and Diclofenac was prescribed for his shoulder pain. Computed radiography of the right shoulder, obtained the same date, showed a remote defect involving the distal clavicle, which was suggestive of mild degenerative changes in the right acromioclavicular joint.

The claimant again saw Nurse Soileau on July 10, 2017.[28] It was noted that his neck pain, low back pain, and right shoulder pain were persisting. He was still awaiting physical therapy. His blood pressure was again high. He was referred to the University Health Center orthopedics clinic for his shoulder pain, and his medications were continued.

---

[27]    Rec. Doc. 11-1 at 326-332.

[28]    Rec. Doc. 11-1 at 341.

The claimant saw Nurse Soileau again on August 14, 2017.[29]  His pain complaints were unchanged.  He had a decreased range of motion in his right arm. His medications were continued.

On November 9, 2017, the claimant testified at a hearing regarding his impairments and his functional abilities.  He testified that his last significant work was in 2005, that he tried to work after that but was unable to do so because he could not pass necessary classes due to his illiteracy.  He testified that he failed the first grade, failed the fourth grade, and was in the sixth grade for three years before dropping out of school at age fifteen.  He testified that he never learned to read.  He stated that he worked for several years as a roustabout, roughneck, rigger, and driller in the oil and gas industry, getting hired on because of personal contacts.  He claimed, however, that once the drilling companies started requiring formal training and the passage of written tests by job applicants, he was no longer able to get a job due to his illiteracy.  The claimant testified that his neck and back pain hurt all day long and that he takes Gabapentin for the pain, which helps "a little bit."  He stated that he had not had injections in his neck or back and testified that no doctor had recommended surgery for his back or his neck; however, he had upcoming appointments scheduled with an orthopedic surgeon and a neurologist.  He stated

---

[29]    Rec. Doc. 11-1 at 342-347.

that his right arm became numb every now and then, that he had trouble holding objects in his right hand, and that he was no longer driving. He stated that he had numbness and tingling down both legs. He denied being treated for depression or anxiety. He stated that his right shoulder pain made him unable to reach overhead with his right arm. With regard to daily activities, the claimant testified that he watched TV and laid in bed most days. He denied having any hobbies but stated that he visited with family members. He denied doing his own grocery shopping, laundry, cooking, housework, or yard work. Instead, he said that his sisters or his daughters did those chores for him. He stated, however, that he took care of his personal hygiene and dressed himself. He testified that he could not walk very far because of back pain.

On February 7, 2018, the claimant had EMG and NCV studies at Tulane University's School of Medicine, Department of Neurology, which showed right C3-4 radiculopathy with active denervation.[30]

On April 3, 2018, the claimant was seen in the orthopedics clinic at University Hospital & Clinics in Lafayette, Louisiana.[31] He was diagnosed with rotator cuff syndrome of the right shoulder and given a steroid injection in the joint. Physical

---

[30]    Rec. Doc. 11-1 at 55-57.

[31]    Rec. Doc. 11-1 at 13-49.

therapy was ordered in addition to home exercises, and he was to return in four months.

The claimant now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[32] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[33] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[34]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[35]  In reviewing the Commissioner's findings, a

---

[32]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[33]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[34]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[35]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[36]  Conflicts in the evidence[37] and credibility assessments[38] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[39]

## B.    Entitlement to Benefits

The SSI program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled.[40]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

---

[36]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[37]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[38]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[39]    *Wren v. Sullivan*, 925 F.2d at 126.

[40]    42 U.S.C. § 1382(a)(1) & (2).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1765, 1772 (2019).

period of not less than twelve months."[41]  A claimant is disabled only if his physical or mental impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[42]

## C.    **Evaluation Process and Burden of Proof**

A sequential five-step inquiry is used to determine whether a claimant is disabled.  The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[43]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[44] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in

---

[41]    42 U.S.C. § 1382c(a)(3)(A).

[42]    42 U.S.C. § 1382c(a)(3)(B).

[43]    20 C.F.R. § 404.1520.

[44]    20 C.F.R. § 404.1520(a)(4).

the record.[45]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[46]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[47]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[48]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[49]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[50]

---

[45]     20 C.F.R. § 404.1545(a)(1).

[46]     20 C.F.R. § 404.1520(e).

[47]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[48]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[49]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[50]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

**D.**    <u>**The ALJ's Findings and Conclusions**</u>

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since January 21, 2016, the application date.[51]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:   degenerative disc disease of the cervical and lumbar spine, hypertension, and obesity.  This finding is supported by substantial evidence in the record.[52]

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[53]  The claimant did not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform light work except that he can only occasionally kneel, stoop, crouch, and crawl; he can never climb ramps, stairs, ladders, ropes, or scaffolds; and he can only occasionally reach overhead on the right.[54]  The claimant challenged this finding.

---

[51]    Rec. Doc. 11-1 at 66.

[52]    Rec. Doc. 11-1 at 66.

[53]    Rec. Doc. 11-1 at 67.

[54]    Rec. Doc. 11-1 at 67.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work.[55]  The claimant did not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from January 21, 2016 (the application date) through December 28, 2017 (the date of the decision) because there are jobs in the national economy that he can perform.[56]  The claimant challenged this finding.

**E.    The Allegations of Error**

The claimant contends that the ALJ erred (1) in failing to properly analyze this borderline age case; (2) in failing to present the claimant's actual education level to the vocational expert at the hearing; (3) in substituting her own judgment for that of the consulting examiner; (4) in failing to evaluate the claimant's mental impairment; and (5) in deciding the case without being properly appointed.

**F.    Did the ALJ Properly Analyze the Claimant's Age?**

The claimant was fifty-two years old when he applied for SSI benefits, he was fifty-four years old when he testified at the hearing, and he was approximately five months shy of his fifty-fifth birthday when the ALJ issued her ruling.  The claimant argued that this was a borderline age situation, in which the ALJ should have considered whether the claimant should be deemed as having already progressed

---

[55]    Rec. Doc. 11-1 at 70.

[56]    Rec. Doc. 11-1 at 71.

from the "approaching advanced age" category to the "advanced age" category under the Medical-Vocational Guidelines of the Social Security regulations (also known as the Grid Rules).

The Grid Rules, which are found at 20 C.F.R. Part 404, Subpart P, Appendix 2, were designed to improve the uniformity and the efficiency of an ALJ's Step Five determination.[57]  The Grid Rules are a matrix of the four factors – physical ability, age, education, and work experience – that are used to determine whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy.[58]   When a claimant's qualifications correspond to the job requirements identified in a Grid Rule, the rule directs a mandatory conclusion as to whether work exists that the claimant could perform; if such work exists, the claimant is not considered disabled.[59]

Under Grid Rules 202.10 and 202.11, a person is not disabled if he is closely approaching advanced age, i.e., between 50 and 54 years of age, has a limited education or less but is at least literate, has the residual functional capacity to do light work, and has no transferable skills.  Under Grid Rule 202.02, however, if that same person is of advanced age, i.e., 55 years of age or older, he is deemed disabled.

---

[57]     *Heckler v. Campbell*, 461 U.S. 458, 461 (1983).

[58]     *Heckler v. Campbell*, 461 U.S. at 461.

[59]     *Heckler v. Campbell*, 461 U.S. at 462.

18

Therefore, the claimant in this case would be disabled under Grid Rule 202.02 but not disabled under Grid Rules 202.10 or 202.11. These rules recognize that when a claimant is considered to be of "advanced age," he has reached the point at which "age significantly affects a person's ability to do substantial gainful activity."[60] Any determination dictated by the Grid Rules is conclusive and cannot be disregarded on the basis of testimony from a vocational expert.[61] "There is no provision in either the Social Security Act or the regulations for an ALJ to rebut a conclusion of disabled in the grids by the use of vocational expert testimony."[62]

The Social Security regulations specifically address how the Grid Rules should be applied when a claimant's age will soon place him in another category.

> We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.[63]

Thus, a "borderline situation" exists when the claimant is within a few days to a few months of the next older age category and applying the Grid Rules for the older age

---

[60]    20 C.F.R. § 404.1563.

[61]    20 C.F.R. § 404.1569.

[62]    *Ware v. Colvin*, No. 3-12-CV—291-RFC, 2014 WL 4999276, at *11 (W.D. Tex. Oct. 7, 2014) (citing SSR 83–5a, 1983 WL 31250; and *Horsley v. Colvin*, No. 1:12-CV-273-DAS, 2014 WL 1213467 at *5 (N.D. Miss, Mar. 24, 2014)).

[63]    20 C.F.R. § 416.963(b).

category would result in a determination that the claimant is disabled.  When those two conditions are met, the ALJ must consider whether the next higher age category should be used.

Adjudicators are required to use "the age categories that apply to you during the period for which we must determine if you are disabled."[64]  In this case, the claimant's chronological age remained in the "closely approaching advanced age" category through the date of the ALJ's decision, but he aged into the "borderline range" during the pendency of his application.  Neither the Social Security Administration nor the courts have defined precisely what set of circumstances create a borderline situation.[65]  According to the Fifth Circuit, the absence of a clear definition means that the Commissioner has significant discretion to determine when a situation is borderline.[66]  As a general rule, however, a person who is within six months of the next higher age category is considered to be in a borderline situation.[67]  When a borderline situation exists, the ALJ is required to "consider whether to use the older age category after evaluating the overall impact of all the factors of [the

---

[64]    20 C.F.R. § 404.1563(b).

[65]    *Parker v. Colvin*, No. 5:13-cv-54(DCB)(MTP), 2014 WL 4639452, at *12 (S.D. Miss. Sept. 16, 2014) (citing *Walhood v. Secretary of Health and Human Services*, 875 F.Supp 1278, 1284 (E.D. Tex. 1995)).

[66]    *Stanridge-Salazar v. Massanari*, 254 F.3d 70, at *2 (5th Cir. 2001) (per curiam) (citing *Harrell v. Bowen*, 862 F.2d 471, 479 (5th Cir. 1998)).

[67]    See, e.g., *Parker v. Colvin*, 2014 WL 4639452, at *12, and the cases cited there.

claimant's] case."[68]  Furthermore, case law dictates that the age to be applied in making a grid determination is the age at the time of the decision – not at the alleged date for onset of disability or the date of application.[69]

In her written ruling, however, the ALJ did not specifically address the claimant's borderline age situation.  In the ruling, the ALJ noted that the claimant testified at the hearing that he was fifty-four years old.  She also noted that the claimant was born on May 31, 1963 and was fifty-two years old when he applied for benefits.  But the ALJ did not mention the claimant's age or the proximity of his upcoming birthday when discussing Step Five of the sequential analysis.  There, the ALJ stated that she was using the Grid Rules as a framework and relying on the vocational expert's opinion that there were jobs that exist in significant numbers that the claimant could perform, considering his age, education, work experience, and residual functional capacity.  She did not mention the fact that the claimant would reach "advanced age" less than six months after her ruling was issued.

The Commissioner argued that the claimant failed to show that the ALJ's reliance on the vocational expert rather than application of the Grid Rules was an abuse of discretion.  But the Commissioner has the burden of proof at Step Five –

---

[68]    20 C.F.R. § 416.963(b).

[69]    *Walhood v. Sec. of Health & Human Services*, 875 F. Supp. 1278, 1284 (E.D. Tex. 1995) (citing *Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 780 (6th Cir. 1987)).

not the claimant.  Part of that burden is the requirement that an ALJ must consider whether the higher age category should be used when the claimant is within a few months of reaching a milestone birthday that propels him into another age category. In this case, however, the ALJ's decision does not indicate that the ALJ recognized this case as presenting a borderline age situation.  There may be substantial evidence to support the use of the claimant's chronological age as the basis of the required finding at Step Five, but there is nothing in the ALJ's ruling to indicate that the ALJ considered whether the use of the older age category would be more appropriate or to indicate that she made the determination that it would not be more appropriate. Therefore, the ruling does not reflect an exercise of discretion by the ALJ in declining to move the claimant into the advanced age category.

Here, the ALJ's decision that the claimant was not disabled was not based solely on the Grid Rules.  The ALJ also considered testimony from a vocational expert that there were jobs in the national economy that the claimant could perform. At the hearing in this case, the ALJ asked the vocational expert to "assume an individual with the claimant's age"[70] in formulating his responses to her hypothetical questions.  This was a reference to the claimant's precise chronological age.  The ALJ did not, at any point, ask the vocational expert to address whether there were

---

[70]    Rec. Doc. 11-1 at 104.

jobs available for an older individual.  At least three courts in the Fifth Circuit have decided that where there is no indication in the record that the ALJ considered and exercised discretion to not apply the higher age category in a borderline age situation, reliance on vocational expert testimony that there are other jobs that the claimant can perform, which otherwise would be sufficient to support the ALJ's disability determination, is insufficient to satisfy the court that the ALJ's decision applied the appropriate legal standards and is therefore an insufficient basis on which to affirm the Commissioner's decision.[71]

This Court finds that the ALJ's references to the claimant's age, set forth expressly in her ruling, are insufficient to show that the ALJ recognized or considered the claimant's borderline age situation, as required by the regulations.  In fact, this Court finds no evidence in the record showing that the ALJ considered the fact that the claimant would soon have his fifty-fifth birthday.  Because the ALJ did not acknowledge or discuss the claimant's borderline age situation, this Court further finds that the Grid Rules were applied mechanically and in violation of the relevant regulation.  Because application of the older age category would change the outcome of this case, this Court is unable to conclude that the error was harmless.  Under the

---

[71]    See *Ware v. Colvin*,  2014 WL 4999276, at *11; *Horsley v. Colvin*, No. 1:12CV273-DAS, 2014 WL 1213467, at *5 (N.D. Miss. Mar. 24, 2014) (unpublished); *Manning v. Colvin*, No. 3:13-CV-2178-D, 2014 WL 266417, at *7-8 (N.D. Tex. Jan. 24, 2014) (unpublished).

circumstances of this case, the Court cannot conclude that the ALJ's decision is supported by substantial evidence. Therefore, this Court will recommend that the Commissioner's decision should be vacated and this matter should be remanded for further proceedings.

G.  **Did the ALJ Properly Present the Claimant's Educational Level to the Vocational Expert?**

The claimant argued that the vocational expert's hearing testimony was unreliable because the ALJ failed to make clear to the vocational expert that the claimant had a marginal education rather than a limited education. The Social Security regulations categorize educational achievement as either illiteracy, marginal education, limited education, high school education and above, or inability to communicate in English.[72] A claimant is generally considered to have a marginal education when he has completed the sixth grade or less, while a claimant is generally considered to have a limited education when he has completed the seventh through the eleventh grade.[73] Under the Social Security regulations, a person is considered to be illiterate if he cannot read or write a simple message such as instructions or inventory lists even if he can write his name.[74]

---

[72]     20 C.F.R. § 416.964(b).

[73]     20 C.F.R. § 416.964(b)(2), (3).

[74]     20 C.F.R. § 404.1564(b)(1)

At the hearing, the claimant testified that he was in the sixth grade for three years before dropping out of school at age fifteen. He further testified that he could not read. The vocational expert was asked if he had heard the claimant's testimony regarding his work history and reviewed the exhibits, and the vocational expert replied that he had.[75] This Court therefore assumes that the vocational expert also heard the claimant's testimony regarding his education. When the ALJ posed hypothetical questions to the vocational expert, she asked him to assume that they were discussing an individual with the claimant's age, education, and work experience.[76] Therefore, this Court finds that the vocational expert was made aware of the claimant's educational level at the hearing and was asked to incorporate his knowledge of the claimant's educational level in his opinions. The vocational expert opined that there were jobs in the national economy that the claimant could perform, but then upon further questioning stated that no jobs were available if the claimant was unable to read. The only way to reconcile these two different opinions is to conclude that he based his opinion that there are jobs available to the claimant on the claimant's having a marginal education including some ability to read, despite the claimant's testimony to the contrary.

---

[75]     Rec. Doc. 11-1 at 102.

[76]     Rec. Doc. 11-1 at 104.

25

In her ruling, the ALJ evaluated the claimant's hearing testimony along with other evidence in the record and concluded that the claimant is not illiterate. A claimant is not per se disabled because of illiteracy under the Social Security regulations,[77] but all jobs listed in the Dictionary of Occupational Titles ("DOT"), which was relied upon by the vocational expert at the hearing, require some literacy.[78] However, the DOT requirement defies common sense because persons who are functionally illiterate can still perform a significant number of unskilled job in the national economy.[79] In this case, for example, the claimant contends that he worked in the oilfield for several years without being able to read, performing work that the DOT classifies as requiring at least some literacy. Thus, there is a conflict in the vocational expert's testimony that arises out of the claimant's assertion that he is illiterate and out of the DOT's requirement of literacy for all jobs.

That conflict, however, is not the basis of the claimant's argument. The vocational expert's opinions were not based on a difference between the claimant having a marginal education or a limited education; they were based on his having

---

[77]     *Towner v. Berryhill*, No. 3:18CV459 DPJ-LRA, 2019 WL 3539817, at *6 (S.D. Miss., July 17, 2019), report and recommendation adopted, 2019 WL 3536959 (S.D. Miss. Aug. 2, 2019); *Aydell v. Berryhill*, No. 17-1181-SDD-EWD, 2019 WL 1417444, at *4 (M.D. La. Mar. 6, 2019), report and recommendation adopted, 2019 WL 1412102 (M.D. La. Mar. 28, 2019); *Lopez v. Colvin*, No. 3:14-CV-00571-BH, 2015 WL 1473677, at *11 (N.D. Tex. Mar. 31, 2015).

[78]     *Towner v. Berryhill*, 2019 WL 3539817, at *6.

[79]     *Charles v. Astrue*, 291 Fed. App'x 552, 555 (5th Cir. 2008).

an ability to read rather being completely illiterate. Therefore, had the ALJ specifically asked the vocational expert to consider the claimant as having a marginal education rather than a limited education, the vocational expert's opinions likely would not have changed.

Furthermore, the claimant argued that the vocational expert's testimony should have been disregarded and the Grid Rules should have been applied. The relevant Grid Rules (discussed above) do not make a distinction between marginal education and limited education. Therefore, if those rules had been applied, the distinction between marginal education and limited education would not have mattered. For these reasons, the claimant's argument lacks merit.

## H.    Did the ALJ Substitute her own Judgment for that of the Consulting Examiner?

In evaluating the claimant's residual functional capacity, the ALJ found that the claimant has the ability to perform light work with certain restrictions – but without a restriction on the amount of weight he can lift or carry. For Social Security purposes, light work is defined as work that does not require a person to lift more than twenty pounds at a time but frequently requires the lifting or carrying of objects weighing up to ten pounds.[80] Therefore, in this case, the ALJ implicitly found that the claimant is capable of frequently lifting objects weighing up to ten pounds and

---

[80]    SSR 83-10.

sometimes lifting objects weighing between ten and twenty pounds.  Because Dr. Fitch, the consulting examiner, found that the claimant is not capable of lifting more than five pounds with either hand, the claimant argued that the ALJ erred in finding him capable of light work and further argued that the ALJ impermissibly substituted her own opinion for that of the consultative examiner.

A claimant's residual functional capacity is "the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."[81]  The ALJ is responsible for determining a claimant's residual functional capacity.[82]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's abilities despite any physical and mental limitations.[83]  The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.[84]  In making a residual functional capacity assessment, an ALJ must consider all symptoms and

---

[81]    *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

[82]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[83]    *Martinez v. Chater*, 64 F.3d at 176.

[84]    *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).

the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.[85]

Although Dr. Fitch opined that the claimant is unable to lift more than five pounds with either hand, there is conflicting evidence in the record. In fact, there is conflicting evidence in Dr. Fitch's own report. The claimant complained to Dr. Fitch of problems with his right arm only, and he told her that he had difficulty lifting more than ten to twenty-five pounds with his right arm. Dr. Fitch found that the claimant had normal strength in both arms; a normal range of motion in his shoulders, elbows, wrists, and hands; normal reflexes in his biceps; no evidence of muscular atrophy; and normal fine and gross manipulative skills in both hands. Therefore, her opinion that he could lift only five pounds with both his left and right arms is inconsistent with her own examination findings and also with the claimant's own estimation of his lifting ability. Consequently, the ALJ did not err in discounting Dr. Fitch's opinion with regard to the claimant's lifting ability.

---

[85]    *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

## I.    <u>Did the ALJ Properly Evaluate the Claimant's Mental Impairment</u>?

The claimant argued that the ALJ erred in failing to use a special technique at Step Two of the requisite sequential analysis to evaluate the claimant's mental impairments and their impact on the claimant's ability to work. However, the claimant did not mention any mental impairments in his application for benefits nor does the record contain any evidence that he was ever treated for any mental impairments. At the hearing, the claimant specifically denied being treated for anxiety or depression. Therefore, the claimant failed to prove that he has any mental impairments. For that reason, the ALJ did not err in failing to discuss mental impairments in her ruling.

## J.    <u>Did the ALJ Decide the Case Without Being Properly Appointed</u>?

The claimant argued that the ALJ's ruling should be reversed because the ALJ was not properly appointed to that position in accordance with the Appointments Clause of the United States Constitution until after the ruling was issued, relying on the United States Supreme Court's decision in *Lucia v. Securities and Exchange Commission*.[86] The Commissioner argued, to the contrary, that the claimant's Appointments Clause argument was forfeited because it was not raised at the administrative level. While the Fifth Circuit has not yet weighed in on this issue,

---

[86]    *Lucia v. Securities and Exchange Commission*, 138 S.Ct. 2044 (2018).

many district courts have decided that this issue must be raised at the administrative level.[87]   This is based, in large part, on the Supreme Court's emphasis on the necessity of "a *timely* challenge to the constitutional validity of the appointment of an officer who adjudicates his case,"[88] which was echoed in a statement from the agency explaining that the Social Security Administration "will process requests for review that include a *timely administrative challenge* to the ALJ's authority based on the Appointments Clause. . . ."[89]

Furthermore, after *Lucia* was decided, the Acting Commissioner of the Social Security Administration, on July 16, 2018, ratified the appointment of all Social Security ALJs and approved those appointments as her own,[90] curing the agency's prior failure to appoint ALJs in accordance with the Appointments Clause.  The claimant did not argue that the ALJ who decided his case was not qualified for the position or that there were any impediments to her rendering a fair decision other than the fact that she was not properly appointed before the ruling was issued.  This

---

[87]     See, e.g., *Perkins v. Berryhill*, No. 4:18-CV-664-A, 2019 WL 2997082, a*4 (N.D. Tex. June 21, 2019) (and the cases cited therein); *Velasquez v. Berryhill*, No. 17-17740, 2018 WL 6920457, at *3 (E.D. La. Dec. 17, 2018), report and recommendation adopted, 2019 WL 77248 (E.D. La. Jan. 2, 2019).

[88]     *Lucia v. Securities and Exchange Commission*, 138 S.Ct. 2044, 2055 (2018) (emphasis added) (quoting *Ryder v. United States*, 515 U.S. 177, 182-83 (1995)).

[89]     SSR 19-1P, 2019 WL 1324866 (emphasis added).

[90]     SSR 19-1P.

Court therefore finds that the issued was mooted by the Acting Commissioner's approval of her appointment.  For these reasons, this assignment of error lacks merit.

## Conclusion and Recommendation

For the foregoing reasons, this Court recommends that the Commissioner's decision should be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to consider whether the Grid Rules should be applied to find that the claimant, who was on the borderline between "approaching advanced age" and "advanced age" at the time of the ALJ's decision, should be deemed disabled.  Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act ("EAJA").[91]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

---

[91]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[92]

Signed in Lafayette, Louisiana, this 20th day of November 2019.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[92]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).